Next case is Greenbrier v. U.S., number 2007-5100. Mr. Gager. Good morning. On behalf of the owner, thank you for considering this appeal. We are here today seeking extraordinary relief from this court. Extraordinary circumstances, extraordinary relief is justified by extraordinary circumstances. Mr. Counsel, you're arguing to us that Anaheim and San Diego Gardens changed the law, and that as a result of this change in the law, that the Greenbrier folks ought to be entitled to a 60-year reconsideration, right? That's one of our arguments. Okay, how could a panel decision like Anaheim or San Diego Gardens change the law? I think maybe a better way to describe it was that it refined the law. Okay, but Greenbrier came first. So Anaheim and San Diego Gardens couldn't have exactly changed the law as it would have applied to the Greenbrier plaintiffs, because otherwise it would be inappropriate. This court, the panel, is not committed to change the law. Well, the rule that the panel, the prior panel rule, if you will, is not, I don't think, a hard and fast rule. There are some exceptions. There's some flexibility to it. But so some of the panel is entitled to exactly change the law of an earlier panel decision. I don't think it's entitled to change it, but I think it is entitled, and I think that's in fact what happened last fall in the Sienega case. The Sienega panel actually went back, revisited its prior decisions, and it found that there was an incomplete record and that the government had advanced some additional arguments. In fact, that is what Judge Newman's dissent was all about. She didn't think that that was an appropriate thing to do, but in fact, that is what happened. So certainly the rule is a prior panel decision. It's something that has to be respected, of course, but I don't think that it is a rule that is without a certain amount of flexibility. So if we had a few well-tended cowboys at some point in time who violated the rule of South Corp and other cases of not only this court but the Supreme Court that talks consistently about stare decisis and the incredible importance of the law, maintaining continuity and consistency, that we ought to similarly act with such disregard for all of those precedents? No, I'm certainly not suggesting that this court should disregard a prior panel decision. Of course, the court needs to reconcile whatever decision is in front of it with its prior decisions. But I think as the Sienega case last fall illustrated, when you have a case where there is an incomplete record and there are incomplete arguments, which is exactly what this case involves, then there is room, there is flexibility to refine that decision in a subsequent decision. But again, that's what Judge Newman's dissent was all about. Isn't this case pretty distinguishable from Sienega Gardens and Adonai? When this case was presented, it was very early on in the process of examining this circumstance. As I read the record, it seems to me that the case that was originally presented was simply a facial challenge to the statute and the impact of the statute, Elissa and Libra, on what was prior to this statute, the unfettered right of the owners to prepay after 20 years. And all of a sudden, after the statute, that unrestricted right was now restricted. And that, in and of itself, was either a contract violation or a taint. And in due course, those issues were resolved. But it was an entirely, it seemed to me, an entirely facial challenge to the impact of the statute, independent of the factual questions that really became central in Sienega and Adonai. Right. I mean, initially, of course, we weren't involved at that stage. But initially, the focus was on an as-applied theory. However, in the complaint, there was also an allegation that it would have been impossible for these prepayment applications to be granted. So there was a futility allegation in the actual complaint. There was also a futility allegation in the robust findings. In fact, they were associated with dispositive motions at that time. Now, I think, so the allegation has always been part of this case that the process was futile. Now, why wasn't discovery? Well, discovery. It didn't seem to me to be the focus of that litigation or the decision at all. Well, it certainly wasn't the focus of the decision, because I think there's a reason why. If you look back through the record, you'll see from the docket sheet that's attached to these cases, there was an attempt by the plaintiffs to conduct discovery in this case. There was a motion to propel, and then there was a subsequent motion for protection of the government. So there was no discovery, really, conducted in this case. And certainly, there was no way you could characterize the argument in this case as being complete. So you had a situation where, yes, there was an emphasis on the as-applied argument. But again, this was at the very beginning of all these cases. No one had the benefit of really prior precedent. So understood. Understood. But still. You know, it seems to me you're arguing the case you wish you had rather than the case you had. Well, I think that it is fair to say that as the law evolved and as the cases evolved, it became more clear that an incomplete record, that arguments that hadn't been made, were being allowed and being presented as the case went about. And all we're asking for, all we're asking for is- Is that what Rule 60b-6 is all about? I think Rule 60b-6 contemplates extraordinary circumstances in the interest of seeing that justice is done. But, Mr. Yeager, let me ask you a question. Greenbriar 1, we have a whole series of achievements. These are almost like subsequent stories as each one of these cases evolved. In Greenbriar 1, this was 193, in fact, 13-48 was 1996. There was a ruling that the taken claims are unripe because no final decision was made and no evidence of utility was incorporated in that ruling. In Siena 6, or Siena 2, it was 265-1237, which was in 2001, that taking this claim was determined to be ripe at that point, based on a utility challenge. Why did you wait so long before bringing this particular motion? Because you're talking about the 2001- I'm talking about 2001, Siena 6, or Siena 2, or whatever. Well, I can only speak sort of in retrospect, but it seemed to me that the case law was still evolving. You had the Siena opinion in 2001. It was a remand, however, and it was a remand that had specifically to do with the ripeness issue. The Siena remand was not issued until 2005. At that point, we now learned that there's what amounts to devastating testimony from HUD witnesses that this process is completely futile. That's not necessarily true, because in Siena 2, 265-1239, the panel differentiated the five model players in Siena from the owners in Greenbrook. They said, we know that the claim of $249 of low-income housing projects were not ripe, because none of them pursued statutory remedies with HUD if we pay their mortgage. So didn't that point to the futility argument? At that point, if you wanted to, you could have brought in the futility argument completely, but you never did. Well, I don't think that at that point that the argument had completely crystallized. I think you could argue, in retrospect, yes, everybody could argue in 20-20 hindsight that, ah, you should have, at that point, immediately filed your appeal. Well, that's what you're arguing now. Well, but that's the case. The law was evolving. The law is still evolving. Last fall, this court sent the case back. Nobody has really figured out what is going on in all these cases. Everything is evolving. And, in fact, in 2006, when Anaheim Gardens came down, that was also another case that helped make it clear that there was a different subset, that Siena had actually created a different subset of plaintiffs and acknowledged the sort of refinement or exception, if you will, in the Siena case in 2001, that people who are in these circumstances and have not had a chance to develop their record are entitled to their day in court. The problem is, Your Honor, if I may, that is exactly where we fit in. The owners are exactly like the non-model plaintiffs in the Siena case. I don't think the Siena case developed a two-set of plaintiffs. Well, that's what the Anaheim Gardens case did acknowledge. It recognized that there was a subset of plaintiffs that had been created in that case. Only the four-model plaintiffs would carve that. But there was also the subset, and respectfully, Your Honor, Anaheim Gardens specifically mentioned the subset of plaintiffs who were not allowed their day in court, who were not allowed to develop the record. And in this case, these plaintiffs simply did not have their day in court. Well, that's the only thing that... Maybe the Anaheim case specifically distinguishes the Greenbrier appellants. Unlike the plaintiffs in Greenbrier, appellants have pled that they have applied for relief. Well, it seems to me that Anaheim, then, is not a case about utility, right? Anaheim is a case about people who have actually pled for relief. So I just don't... here's my problem. But that's what our plaintiffs did. They applied for relief. They are no different than any of the plaintiffs that are in either Cienega or in Anaheim Gardens. There's simply no meaningful way to distinguish our clients from that. They pled for relief, and how long did they wait for the file? That is... we don't know, because that discovery was never developed. Well, you know, in the Anaheim case, HUD missed its own statutory deadlines, which is why the court opened up and allowed it.  And that's why the court didn't go to a futility, and they specifically accepted the Greenbrier people on that basis. So the Anaheim case isn't really a futility case, the way you're trying to characterize it. It doesn't build upon Cienega Gardens and reach the same conclusion. It's a completely different argument at issue in Anaheim, which is not one that you're making now before us. You're not making an argument like Anaheim that HUD missed its deadlines, and that's why you're entitled to relief, which brings you back only to Cienega Gardens as the basis for your argument here today, and brings me back to Judge Gajar's concerns about time limits. Again, all I can say is that this case law was evolving, and there was a remand. The remand didn't come down until 2005. And at that point, there was actual testimony that was adduced at the trial indicating that not only was the process futile in specific regions, but in the entire Region 9, which is California, Nevada, and Arizona. And there was even testimony that said nationwide that the whole process is simply something that can't be achieved. So this was not something where it was ambulatory. The law was evolving. And I should also point out, it isn't just simply a question of whether or not we came forward in a timely manner. You also have to look at whether or not there was any prejudice to the government as a result of all of this. And I don't think there's any question that the government was not prejudiced by any of this. These cases continue on apace. There simply is no credible allegation to be made that the government's been prejudiced in all of this. Do you have any words there for your fellow attorney? If I could, unless the Court has some questions that I can address right now. That's fine. Thank you. Okay, thank you. Thank you. Counselor, if you could start with the timeliness, particularly the last point that the opposing counsel left off at, which is the complete absence of evidence of prejudice. Is prejudice a factor in the timeless determination? It's one factor to consider, Your Honor. But as we noted in our brief, certainly whereas here a case has been vital for more than eight years, prejudice is almost presumed in that, as the cases have noted, memories fade, witnesses disappear. Clearly, that applies here where the case is deemed to be over, finally over, for more than eight years. And more than eight years is inaccurate. The cert is denied in 2000, and this is now just 2008. They actually filed this case a little while back, so be a little careful. That's correct, Your Honor. Eight years from the final judgment. That's not when the case is final. Correct. So the absence of prejudice shouldn't be a reason that we find the district, or the claims court abuses discretion in this timeless determination? It should not be a basis to find the court abuses discretion. Of course, it's just one consideration. And secondly, the plaintiffs, simply by saying there's no prejudice, haven't established that, that the court would abuse its discretion. You said it's just one, but what are the other factors? The other factors are the reason for the delay. Are they saying that the law is still evolving? That's the reason they've given, but as Judge Barry-Austin noted, the law hasn't evolved, really, in any sense since Greenbar won, actually. The same cases, the same rules of law that this court cited in its first decision in Greenbar were the same cases and same rules they applied in Sienega II and in every other case. That is, the need for a final decision and, alternatively, the excuse from that requirement where it can be shown that the agency has no discretion. This court recognized those rules in Greenbar. This court recognized those same rules in Sienega II. It just simply came out to be the results based upon the factual record. So, as the trial court noted, the factors that the appellants wished to apply here are the very same requirements that Sienega II recognized. And, therefore, at the very least, they could have come in shortly after that decision. Instead, they waited four to five years. And, as Mr. Yeager noted, there was a remand proceeding in that case, but it wasn't the claims of the four model plaintiffs that were remanded. It was the remaining. The four model plaintiffs had been finally and conclusively judged by this court to be right. So, there were no future remand proceedings. And, in any event, as Mr. Yeager noted, those remand proceedings ended in, I believe it was August 2005. And, they did not come into court with their motion until December of 2006. So, that's approximately 15 months. It doesn't explain why there was an additional 15 months of delay. So, the factors that you're telling me that we should look at are the length of time, I assume, as one of them is pointing to it. Whether or not there's prejudice in their reasoning for delay. Is there anything else? If not already included in that, the point at which they were notified of the grounds of their motion. That might be a couple of good reasons for delay. But, those are essentially the factors that should be considered. Turning to the first issue is whether there's an exceptional circumstance here. As Mr. Yeager noted repeatedly, that this is simply a case of an incomplete record where the plaintiffs did not have their day in court. We would submit that this is nothing of the sort at issue here. What it comes down to is, as reflected in the appellant's reply brief at page 8, the last full paragraph starting on that page, the appellant states, quote, the Malloy declaration has been in the record in this case from the beginning and establishes clearly that the claims of the appellant's society use agreements were right. So, according to the appellants, the evidence of futility was in this case from the beginning and shows their claims were right. And that begs the question as to why they did not make that argument to this court in their 1998 agreement. The fact that they elected not to make that argument shows that, as the trial court held here, this is simply a case of tactical litigation decisions that were voluntary and that do not provide a basis for exceptional judgment. Mr. Yeager's additional reference to- We're reaching now the progenies of seven, ten, some of those have had three, four, five different variations and permutations. And it's never sat still on that argument, really. You want to say this is a definitive answer in the law. Well, certainly there have been numerous decisions, and they have been proceeding in different stages. But as to the issue of rightness, it hasn't been. For example, these cases started out as contract cases. Went up and down on the contract, losing no contract. Then it proceeded to takings. The first issue in the takings was the rightness issue. That was decided first by Greenwine and then by Siena II. Then came the merits of the takings issue, which was decided by this court in 2003. And then, subsequently, the issue of just compensation was decided- So the cases- The variations were all part of the same permutation. Well, they're not- It's a question. They're just different issues in a case that has been proceeding. But they've been evolving in that respect from contract to takings to rightness to liability to just compensation. But on the issue in this case, the rightness issue, that hasn't been evolving. That was laid out correctly by this court in Greenwine, the rules respecting rightness. If they had brought this action in 2001 immediately after Seneca Gardens, what would the argument be? The argument would be- I would say that it nevertheless doesn't show exceptional circumstances because the Court of Federal Claims' initial decision in 1998 was twofold. The court first held that the issue of futility didn't even come into play because the appellants had conceded that they didn't apply at least once to prepayment of organs. And the court explained that in circumstances such as that, where there hasn't been at least a first application, the futility exception doesn't come into play because that is designed to protect property owners from having to go through further futile applications where the manner in which the first application is denied shows that further applications would be futile. This court has recognized that principle. So on that issue alone, that would be a basis to deny Rule 60 Relief had that been sought in 2001. Even if they had come in shortly after Seneca II, again, the basis for Rule 60 Relief would not be present because Seneca II didn't change the law in any respect. It didn't hold that Greenbrier was wrongly decided. It simply applied the same law to a different set of plaintiffs who had made different arguments and presented different evidence. And in that respect, even if they had come in and said, well, we wish we had thought about what Seneca II did, the lawyer's there, and we didn't, and we exhausted all of our appeals and didn't think of it, and now we want a second chance. That's just not an opportunity. That's not what Rule 60b-6 is designed for. It's not a substitute for an appeal, and it's not a basis to really relitigate an unsuccessful case. In your honor, the short answer to your question is that we take the same position here. The final point I'd like to make is the reference to the discovery or the lack of discovery. Again, that is a circumstance that is not exceptional. If the plaintiffs felt that they had been cut off on discovery or had been not permitted to make a complete record in the trial court, clearly they could have made that argument to this court in 1998. They elected not to do so. They can't come back now, many years later, under Rule 60b. These reasons and the decision of the trial court should be referred to. Thank you. I'll try to be brief. Concerning this notion that the law has not evolved, I would urge the court to go back and look at how it has evolved, and particularly look at last fall's opinion and see how you go. I think there the court very clearly, probably at the government's behest, looked at the incomplete record and the additional arguments and revisited its prior decision. So I would urge the court to go back and look at that. In essence, all we are looking for here today is to be treated the same as the non-model plaintiffs in Siena, and that is to be given a chance to develop the record that we were never given the opportunity to do because of the motion of protective order that was filed by the government. So all we're looking for— Why did you proceed with individuals to be given? Why did you go and throw 229 rocks off the barrel? I think at the time the choice was they wanted to see if a class action could be pursued. But once that was denied, that was not pretty early on, wasn't it? I don't think it was early on. I think it was denied just before dispositive motions were filed. So it was a situation where the court said, no, you can't have your class in dispositive motions or do it thereafter. I think the rule contemplates exceptional circumstances, and I think those exceptional circumstances are best evidenced by comparing a plaintiff in Siena against a plaintiff in this case. A plaintiff in Covina, California, which is a suburb of Los Angeles in Siena, was given his day in court. A plaintiff just down the road in Ontario, California, which is also an eastern suburb of Los Angeles, because he had the misfortune of filing too soon in this case, he has not had his day in court. There is no way to distinguish between the claims or the facts of that plaintiff in Greenbrier and the plaintiff that was in the Siena case. It simply can't be done. In that respect, I'll point out that both Anaheim Gardens and Siena seem to rely on this 3 out of 8 statistic. And we point it out in our papers. That 3 out of 8 statistic is a national statistic. If it proves a lack of futility for our plaintiffs, it should have done the same for everybody else, but it didn't. The reason is, those people got their day in court. We didn't. So, exceptional circumstances, of course, are required. Yes, there's a prior panel decision, but this is an extraordinary case. It is an extraordinary statute. As the court observed in its opinion last fall, this is hardly a model of draftsmanship. People were struggling. They're trying to find a way to get through this morass, including the courts. So at this point, justice requires that our people be allowed the same opportunity. We're not asking for anything more than that. The same opportunity to develop the record that was afforded to the plaintiffs in Siena. Thank you very much for your consideration. If there are any other questions, I'm happy to answer them. Thank you, Mr. Daly. Patience is good. All rise. The Honorable Court is adjourned tomorrow morning at 10 o'clock a.m.